STEPHANIE ANN BUCK,       )
     Plaintiff,       )
                  )
     v.       )     CAUSE NO.: 2:17-CV-143-PRC
                  )
NANCY A. BERRYHILL,       )
Acting Commissioner of the       )
Social Security Administration,       )
     Defendant.       )

## OPINION AND ORDER

This matter is before the Court on a Complaint [DE 1], filed by Plaintiff Stephanie Ann Buck on March 30, 2017, and Plaintiff's Opening Brief [DE 10], filed by Plaintiff on August 9, 2017. Plaintiff requests that the November 27, 2015 decision of the Administrative Law Judge denying her claim for disability insurance benefits and supplemental security income be reversed and remanded for an award of benefits or for further proceedings. On September 13, 2017, the Commissioner filed a response, and Plaintiff filed a reply on September 26, 2017. For the following reasons, the Court denies Plaintiff's request for remand.

## PROCEDURAL BACKGROUND

On September 4 and September 26, 2013, Plaintiff filed applications for disability insurance benefits and supplemental security income, respectively, alleging disability since July 19, 2013. The applications were denied initially and on reconsideration. On October 29, 2015, Administrative Law Judge Shane McGovern ("ALJ") held a hearing. In attendance at the hearing were Plaintiff, Plaintiff's attorney Randall J. Zromkoski, and an impartial vocational expert. On November 27, 2015, the ALJ issued a written decision denying benefits, making the following findings:

> 1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2017.

2. The claimant has not engaged in substantial gainful activity since July 19, 2013, the alleged onset date.

3. The claimant has the following severe impairments: dysthymic disorder/depression; ADHD; anxiety disorder; learning disorder NOS; seronegative spondyloarthropathy; ankylosing spondylitis; fibromyalgia; morbid obesity; obstructive sleep apnea and asthma.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except she could occasionally push/pull bilaterally; no operation of foot controls; never climb ladders, ropes or scaffolds; never kneel or crawl; occasionally climb ramps and stairs; occasionally balance, stoop and crouch; frequently handle, finger and feel bilaterally; no exposure to extreme cold or extreme heat; no exposure to excessive vibration; occasional exposure to irritants, such as fumes, odors, dusts, gases and poorly ventilated areas; no exposure to unprotected heights or dangerous moving machinery and occasional walking on uneven surfaces. She is further limited to simple, routine and repetitive tasks and frequent interactions with coworkers, but only occasional interaction with the public and supervisors.

6. The claimant has no past relevant work.

7. The claimant was born [in 1987] and was 26 years old, which is defined as a younger individual age 18-49 on the alleged disability onset date.

8. The claimant has at least a high school education and is able to communicate in English.

9. Transferability of job skills is not an issue because the claimant does not have past relevant work.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11. The claimant has not been under a disability, as defined in the Social Security Act, from July 19, 2013, through the date of this decision.

(AR 18-26).

The Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481. Plaintiff filed this civil action pursuant to 42 U.S.C. § 405(g) for review of the Agency's decision.

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c) and 42 U.S.C. § 405(g).

## STANDARD OF REVIEW

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Thus, a court reviewing the findings of an ALJ will reverse only if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. *See Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, or substitute its judgment for that of the ALJ. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, the question upon judicial review of an

ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ "uses the correct legal standards and the decision is supported by substantial evidence." *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013) (citing *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010); *Prochaska v. Barnhart*, 454 F.3d 731, 734-35 (7th Cir. 2006); *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)). "[I]f the Commissioner commits an error of law," the Court may reverse the decision "without regard to the volume of evidence in support of the factual findings." *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999) (citing *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997)).

At a minimum, an ALJ must articulate his analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995). An ALJ must "'build an accurate and logical bridge from the evidence to [the] conclusion' so that [a reviewing court] may assess the validity of the agency's final decision and afford [a claimant] meaningful review." *Giles v. Astrue*, 483 F.3d 483, 487 (7th Cir. 2007) (quoting *Scott*, 297 F.3d at 595)); *see also O'Connor-Spinner*, 627 F.3d at 618 ("An ALJ need not specifically address every piece of evidence, but must provide a 'logical bridge' between the evidence and his conclusions."); *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001) ("[T]he ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits.").

## DISABILITY STANDARD

To be eligible for disability benefits, a claimant must establish that she suffers from a "disability" as defined by the Social Security Act and regulations. The Act defines "disability" as

an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). To be found disabled, the claimant's impairment must not only prevent her from doing her previous work, but considering her age, education, and work experience, it must also prevent her from engaging in any other type of substantial gainful activity that exists in significant numbers in the economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f).

When a claimant alleges a disability, Social Security regulations provide a five-step inquiry to evaluate whether the claimant is entitled to benefits. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The steps are: (1) Is the claimant engaged in substantial gainful activity? If yes, the claimant is not disabled, and the claim is denied; if no, the inquiry proceeds to step two; (2) Does the claimant have an impairment or combination of impairments that are severe? If no, the claimant is not disabled, and the claim is denied; if yes, the inquiry proceeds to step three; (3) Do(es) the impairment(s) meet or equal a listed impairment in the appendix to the regulations? If yes, the claimant is automatically considered disabled; if no, then the inquiry proceeds to step four; (4) Can the claimant do the claimant's past relevant work? If yes, the claimant is not disabled, and the claim is denied; if no, then the inquiry proceeds to step five; (5) Can the claimant perform other work given the claimant's residual functional capacity (RFC), age, education, and experience? If yes, then the claimant is not disabled, and the claim is denied; if no, the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *see also Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004).

At steps four and five, the ALJ must consider an assessment of the claimant's RFC. The RFC "is an administrative assessment of what work-related activities an individual can perform despite [her] limitations." *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001). The RFC should be based on evidence in the record. *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(3)). The claimant bears the burden of proving steps one through four, whereas the burden at step five is on the ALJ. *Zurawski*, 245 F.3d at 885-86; *see also Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

## FACTUAL BACKGROUND

Plaintiff receives mental health treatment from Porter-Starke Services for dysthymic disorder, neurotic depression, learning disorder, anxiety, and attention deficit hyperactivity disorder (ADHD) predominately inattentive-type. (AR 302).[1] In June and July 2013, treatment notes show depressed mood but intact mental status with normal cognition, memory, thought content, and gait and station. (AR 308, 312). Plaintiff reported she was doing well on her medications. (AR 312). Her medication was switched from Prozac to Cymbalta in July 2013, and she subsequently reported through November 2013 that the Cymbalta worked well and that she had good sleep and was able to babysit. (AR 309, 587, 589, 591, 593, 597). In October 2013, Plaintiff reported that she was doing well on her current medications; however, she was trying to cope with social relationship stressors. (AR 593).

In October 2013, Plaintiff received treatment at HealthLinc with a social worker, and the records show mild depression and that journaling helped with stress management. (AR 333, 335).

---

[1] Plaintiff did not provide a medical history in her opening brief. The facts are taken from those presented by the Commissioner and as raised by both parties elsewhere in their briefs.

During this time period, Plaintiff treated with a physician and nurse practitioner and occasionally complained of hip, back, and leg pain, though examinations were unremarkable. (AR 607-619).

In October 2013, Plaintiff underwent a consultative examination with Dr. Bharat Pithadia, to whom she described a history of mental health issues but reported being fine and that her medications helped. (AR 599). Dr. Pithadia noted mild cognitive impairment but stated that Plaintiff answered questions fully and appropriately and was not affected in her daily activities by cognitive limitations. (AR 601). Dr. Pithadia noted that Plaintiff had nonantalgic gait without assistive devices, she had no difficulty getting on and off the table, she could walk on heels and toes and had a normal tandem gait, she could squat, and she had grossly normal range of motion in the neck. (AR 599-601). However, Dr. Pithadia found Plaintiff to have a positive straight leg raise test and limited range of motion in the lumbar spine. (AR 600-01). The physical examination was otherwise normal with full range of motion in the upper and lower extremities. (AR 601). Dr. Pithadia found Plaintiff to have normal power in her hands and commented that Plaintiff's "range of motion with respect to the back was more than adequate." (AR 601). As for physical impairments, Dr. Pithadia noted "none was detected." (AR 601).

On April 26, 2014, Plaintiff presented to the emergency room with complaints of generalized body aches. (AR 636). Plaintiff reported that she has fibromyalgia, that she had trigger points shots in her back the day before, and that she had started to get spasms in her back three hours earlier. *Id.* Physical examination revealed lower back tenderness, pain, and spasm but normal sensation and strength, and she was not prescribed any new medications. (AR 638-39). On May 24, 2014, an x-ray of her thoracic spine revealed mild superior end plate deformity of T11 and T12, and a lumbar spine x-ray showed mild degeneration at L1-L2 and L2-L3. (AR 906-10).

In May 2014, Plaintiff saw Dr. Annie Drachenberg for pain management. She reported that she had joined the YMCA and was able to do fifteen minutes on the elliptical machine without difficulty. (AR 850).

Plaintiff began seeing rheumatologist Vinay Reddy, MD on May 23, 2014, complaining of constant pain for about three to four years. (AR 904). Plaintiff reported discomfort in the legs and back and puffiness of the hands and ankles. *Id*. Dr. Reddy noted that Plaintiff exhibited thirteen positive tender points. *Id*. The remainder of the physical examination was unremarkable, with normal gait with no ambulatory devices and no muscle weakness or tenderness. *Id*. Dr. Reddy noted tenderness in the neck region and the thoracic spine with normal sacroiliac joints, mild tenderness in the lumbar spine with decreased extension and flexion of 100 degrees, and an otherwise normal join examination. *Id*. Dr. Reddy found normal grip strength. *Id*. Dr. Reddy gave a diagnosis of fibromyalgia, rule out spondyloarthropathy, neck pain, and thoracic spine pain. (AR 905).

On June 3, 2014, Plaintiff was hospitalized overnight after self-harming after a fight with her sister, reporting that she started cutting herself on her left arm with a utility knife. (AR 648). On examination, Plaintiff had "extremely superficial scratches to left arm, no active bleeding", depressed mood, and intact memory and cognition. (AR 648, 649, 652). Normal range of motion was noted. (AR 652). Plaintiff was placed on Cymbalta and Abilify. (AR 661). The hospital discharge report indicates "definite, progressive improvement in the presenting signs and symptoms," with Plaintiff reporting that she felt much better. (AR 661, 663). At follow-up on June 26, 2014, Plaintiff had a normal mental status examination, reporting a "great" mood. (AR 774). Dr. Hunter recorded that Plaintiff's mental status exam was unremarkable, including normal gait and station. *Id*.

On August 4, 2014, Plaintiff was seen by Dr. Hunter for follow up. Plaintiff reported that she was diagnosed with ankylosing spondylitis and that she was still in a lot of pain. (AR 764). She reported that the pain added more stress, that she was feeling fatigued, that she was trying to stay active, and that she felt her mood was good. *Id*. A review of systems showed pain and depression. (AR 765). Dr. Hunter's mental status exam of Plaintiff was unremarkable, including normal gait and station. *Id*. Dr. Hunter assessed good symptom control on current medications with an improved condition.

On September 15, 2014, Plaintiff was seen by Dr. Hunter , where she reported that she had been doing really well but that recently she was worried because of a situation with her dog of ten years having bitten her mother. (AR 753). Other than a "worried" mood, her mental status exam by Dr. Hunter was normal. (AR 754-55).

On October 27, 2014, Dr. Drachenberg completed a Medical Source Statement, opining that Plaintiff could sit three hours per day, needed to alternate sitting and standing every fifteen minutes, could lift no more than twenty pounds, could lift twenty pounds occasionally and five pounds frequently, and did not need an ambulatory device. (AR 672-79). Dr. Drachenberg opined that Plaintiff could constantly balance, occasionally stoop, occasionally do postures of the neck, and occasionally reach, handle, and finger with both hands. (AR 676-77). Dr. Drachenberg opined that Plaintiff should avoid concentrated exposure to extreme cold, high humidity, perfumes, solvents/cleaners, and fumes, odors, and gases. (AR 678). Dr. Drachenberg opined that Plaintiff should avoid even moderate exposure to cigarette smoke, dust, and chemicals. *Id*.

On November 19, 2014, Dr. Hunter completed a Medical Source Statement, opining that Plaintiff could carry out, understand, and remember very short simple instructions and could make

simple work-related decisions but had marked difficulty with detailed tasks, moderate difficulties in semi-skilled and skilled work, and marked loss in sustaining a regular work schedule. (AR 682-83). Dr. Hunter opined that Plaintiff had moderate difficulties with remembering locations and work-like procedures, maintaining attention and concentration for extended periods of time (2-hour segments), maintaining regular attendance and being punctual, sustaining an ordinary routine without special supervision, dealing with the stress of semi-skilled and skilled work, and working in coordination with or proximity to others without being unduly distracted. (AR 683). Regarding the ability to interact appropriately to supervision, coworkers, and work pressure, Dr. Hunter opined that Plaintiff had no difficulty with interacting appropriately with the public, asking simple questions or requesting assistance, maintaining socially appropriate behavior, adhering to basic standards of neatness and cleanliness, being aware of normal hazards and taking appropriate precautions, traveling in unfamiliar places, and setting realistic goals or making plans independently of others; moderate difficulty with getting along with coworkers and peers without unduly distracting them or exhibiting behavioral extremes and in responding appropriately to changes in a routine work setting; and marked difficulty with accepting instructions and responding appropriately to criticism from supervisors. (AR 684). Dr. Hunter opined that Plaintiff would be absent from work as a result of her impairments or treatment more than three times a month. (AR 681).

On February 9, 2015, treating source Dr. Reddy completed a Medical Source Statement, opining among other limitations that Plaintiff could stand two hours per day and sit four hours per day, needed to alternate sitting and standing and needed extra rest breaks, and could lift no more than five pounds. (AR 687-94). Dr. Reddy began seeing Plaintiff on May 23, 2014, with visits every one to three months. (AR 687). Dr. Reddy indicated that Plaintiff had constant pain for three to four

years in the mid and lower back with swelling in the hands and ankles and morning stiffness and fatigue. (AR 687). Dr. Reddy reported objective signs of reduced range of motion in the lumbar spine, reduced grip strength, tenderness, trigger points, and swelling. *Id*. Dr. Reddy indicated that emotional factors did not contribute to the severity of Plaintiff's symptoms and functional limitations. (AR 688). Dr. Reddy further indicated that she did not have any psychological conditions that affected her pain. *Id*. Dr. Reddy opined that Plaintiff is severely limited in her ability to deal with work stress. *Id*. Dr. Reddy opined that Plaintiff can occasionally lift five pounds and never lift over five pounds, can never stoop, and can never perform postures of the neck. (AR 691). Dr. Reddy opined that Plaintiff can occasionally reach, handle, and finger with both hands. (AR 691-92). Dr. Reddy reported that Plaintiff does not use an assistive device. (AR 692). Dr. Reddy opined that Plaintiff would be absent from work more than three times per month and that she should avoid all exposure to environmental conditions. (AR 693).

On November 19, 2014, Plaintiff was seen by Dr. Hunter for completion of her disability paperwork. (AR 746).

On January 12, 2015, Plaintiff reported to Dr. Hunter problems with pain that had been making her feel more irritable. (AR 741). She reported that she has good days and bad days, that her depression "comes and goes," and that she had been unable to go to the gym for six months due to pain. *Id*.

On March 10, 2015, Plaintiff was seen at Porter-Starke Services by clinician Sherry Trace under Dr. Hunter's supervision. (AR 724-28). The mental status exam was unremarkable, including a normal gait and station. (AR 725-26). A treatment plan was put in place to help Plaintiff reduce

her mood symptoms and to learn and utilize positive coping skills. (AR 726). Plaintiff reported that she babysat daily for a family. *Id*.

On March 15, 2015, Plaintiff was seen by Dr. Hunter for follow up. (AR 720). Plaintiff reported that she was having sleep problems because of pain, that she is tired of being in pain, and that she has some stress. (AR 720). Plaintiff's mental status exam was unremarkable, including normal gait and station. (AR 721-22). Dr. Hunter's assessment was that Plaintiff had good symptom control on her current medications, although her medical diagnosis caused her some stress, and that her condition was improved. (AR 722).

On April 6, 2015, Plaintiff was seen at home for a case management appointment with Porter-Starke Services. (AR 716). The case manager reported that Plaintiff had a pleasant mood and congruent affect. *Id*. Plaintiff indicated that she would like to lose weight and go to the YMCA for sessions sponsored by Porter-Starke Services. *Id*.

On April 17, 2015, Plaintiff was seen by the clinician, this time at the YMCA, to discuss and begin a wellness fitness program, walking a half mile. (AR 710). The clinician noted that Plaintiff did not complaint about pain at the appointment. (AR 710).

On May 12, 2015, the clinician met with Plaintiff at her home for a case management appointment and discussed coping skills for organization and for physical pain due to her fibromyalgia acting up. (AR 707). The clinician reported that Plaintiff struggles with managing her emotions due to her dysthymic disorder. *Id*.

On June 18, 2015, the clinician met with Plaintiff at her home for a case management appointment. (AR 698). They again discussed coping mechanisms, and the clinician reported that Plaintiff struggles with managing her emotions due to her dysthymic disorder. *Id.*

On July 7, 2015, Plaintiff was seen by Dr. Jennifer Maya at HealthLinc and reported that she was feeling better and that she was going to the YMCA, which was helping. (AR 798).

On January 25, May 1, June 26, and September 25, 2015, Plaintiff was seen by Dr. Reddy for follow up appointments regarding her back and joint pain and medication management. At each exam, Dr. Reddy observed a normal gait, eleven tender points, no muscle tenderness or weakness, normal sensory examination, tenderness in the neck and thoracic spine, normal sacroiliac joints, mild tenderness in the lumbar spine, flexion of 100 degrees, the remainder of the joint exam unremarkable, and adequate grip strength. (AR 892-98). At the initial visit on May 23, 2014, Dr. Reddy assessed fibromyalgia, rule out spondyloarthropathy, neck pain, and thoracic spine pain. (AR 905). On June 13, 2014, Dr. Reddy assessed fibromyalgia, seronegative spondyloarthropathy, neck pain, and thoracic spine pain. (AR 902). On August 17, 2014, Dr. Reddy assessed fibromyalgia, seronegative spondyloarthropathy, and mild disc disease (noting normal sacroiliac joint, and normal thoracic and cervical spine). (AR 900). However, beginning on October 15, 2014, and then on each of January 25, May 1, June 26, and September 25, 2015, Dr. Reddy assessed only seronegative spondyloarthropathy. (AR 892, 894, 896, 898, 899).

Throughout 2015, Porter-Starke Services documented Plaintiff as having a mostly pleasant mood with congruent affect. (AR 721, 725, 742, 932, 949). In June 2015, Plaintiff stated her only issues were with sleep, having little energy and feeling depressed, but not on a daily basis. (AR 701). She also stated her symptoms made it "somewhat" difficult for her to work. (AR 701). By August 2015, Plaintiff reported her symptoms being under good control with medications. (AR 950). In October 2015, Plaintiff's mental status examination was normal, and she stated that she planned to

attend a healthy cooking class and that she was unable to attend YMCA classes because of her babysitting schedule. (AR 931-32).

## ANALYSIS

Plaintiff seeks remand, arguing that the ALJ erred by failing to (1) properly assess her fybromyalgia; (2) properly evaluate her obesity; (3) analyze Plaintiff's mother's statement under SSR 12-2p; (4) properly weight the opinions of treating physicians; and (5) support the step five finding with substantial evidence. The Court considers each of Plaintiff's arguments in turn.

### A. Fybromyalgia

Plaintiff contends that the ALJ did not properly assess her fybromyalgia, arguing that the ALJ did not explicitly analyze Social Security Ruling 12-2p, that the ALJ erred in the credibility determination, and that the ALJ erred in assessing Plaintiff's mental impairments.

*1.     Social Security Ruling 12-2p*

Social Security Ruling 12-2p provides guidance on how evidence is developed to establish that a person has a medically determinable impairment of fibromyalgia and how fibromyalgia is evaluated in disability claims. SSR 12-2p, 2012 WL 3104869 (July 25, 2012).

First, Plaintiff argues that the ALJ erred by not discussing in the decision either of the two sets of criteria identified in SSR 12-2p for establishing fybromyalgia as a medically determinable impairment. *See* SSR 12-2p, 2012 WL 3104869, at *2-3. However, Plaintiff does not explain how this was an error. The two sets of criteria are used to determine whether an individual has a medically determinable impairment of fibromyalgia. *Id*. In this case, the ALJ found Plaintiff's fibromyalgia to be a medically determinable impairment and to be a severe impairment at step two of the sequential analysis, stating that the impairment was established by the evidence. (AR 18-19);

*compare McGillem v. Berryhill*, 1:17-CV-1386, 2018 WL 656343, at *3 (S.D. Ind. Feb. 1, 2018) (finding the ALJ erred by not discussing the diagnostic criteria when finding the claimant's fibromyalgia was *not* a severe impairment at step two). It is unclear how a specific discussion of the sets of criteria would affect the outcome in this case. Plaintiff has not cited any medical evidence regarding her fibromyalgia that the ALJ failed to consider. Nor has Plaintiff cited any law that the ALJ is required to discuss the two sets of criteria in the written decision when the ALJ finds fibromyalgia to be a severe medically determinable impairment at step two. The Court notes that Plaintiff does not argue in her opening brief that the ALJ erred in considering Plaintiff's fibromyalgia under the Listing of Impairments at step three of the sequential analysis. Remand is not required on this basis.

Second, Plaintiff argues that the ALJ gave "mixed signals" about his consideration of Plaintiff's fibromyalgia diagnosis. (ECF 19, p. 10). Plaintiff recognizes that the ALJ found her fibromyalgia to be a severe impairment at step two but then contends that, in determining her RFC, the ALJ gave the impression that the criteria were not met. In support, Plaintiff quotes a sentence from the ALJ's RFC determination: "[S]he has some positive tender points in 2014 pointing to fibromyalgia but then more recently, she had fewer tender points that are typically required for a diagnosis of fibromyalgia." (AR 25). Plaintiff does not dispute that this statement accurately reflects the evidence of record, as set forth above in the factual background. The ALJ makes this comment in the context of weighing the treating physician's opinion along with examining several other pieces of evidence regarding Plaintiff's treatment history as to the extent of her limitations and complaints of pain. At no point does the ALJ change his finding that Plaintiff has the severe impairment of fibromyalgia. Plaintiff also notes that the ALJ recognized that the Plaintiff's

"rheumatologist originally assessed her with fibromyalgia, spine pain and seronegative spondyloarthropy, but her more recent diagnosis has only been seronegative spondyloarthropy." (AR 24). Again, this statement by the ALJ is an accurate recitation of the medical evidence of record. Plaintiff does not explain how the ALJ's reliance on this fact is in error.

Contrary to Plaintiff's assertion, the ALJ's discussion of these two pieces of record evidence does not give the impression that the ALJ no longer finds that Plaintiff meets the criteria in SSR 12-2p for fibromyalgia. The determination of a medically determinable impairment and severity at step two is "merely a threshold requirement." *Curvin v. Colvin*, 778 F.3d 645, 648 (7th Cir. 2015). The ALJ is then required to go on and determine the RFC based on the evidence of record, as the ALJ did in this case. The ALJ did not "waffle" on the finding that Plaintiff has fibromyalgia, and, again, Plaintiff does not identify any evidence regarding her fibromyalgia that demonstrates greater restrictions than those imposed by the ALJ. *Compare McGillem*, 2018 WL 656343, at *3 (finding, in a case in which the ALJ found that fibromyalgia was not a severe impairment at step two, that remand was required because of the ALJ's inconsistent treatment of the evidence of the claimant's fibromyalgia, including the ALJ's failure to note the examiner's finding of diffuse tenderness and a diagnosis of soft tissue rheumatism/fibromyalgia). It was reasonable for the ALJ to resolve the threshold inquiry at step two in Plaintiff's favor but then to determine that the evidence does not support a finding of disability based on her fibromyalgia.

## 2.  *Credibility Determination*

Next, Plaintiff argues that the ALJ erred in the credibility determination in relation to her daily activities and her fibromyalgia. In making a disability determination, the ALJ must consider a claimant's statements about her symptoms, such as pain, and how the symptoms affect her daily

life and ability to work. *See* 20 C.F.R. §§ 404.1529(a), 416.929(a). Subjective allegations of disabling symptoms alone cannot support a finding of disability. *Id*. The ALJ must weigh the claimant's subjective complaints, the relevant objective medical evidence, and any other evidence of the following factors:

> (1)    The individual's daily activities;
> (2)    Location, duration, frequency, and intensity of pain or other symptoms;
> (3)    Precipitating and aggravating factors;
> (4)    Type, dosage, effectiveness, and side effects of any medication;
> (5)    Treatment, other than medication, for relief of pain or other symptoms;
> (6)    Other measures taken to relieve pain or other symptoms;
> (7)    Other factors concerning functional limitations due to pain or other symptoms.

*See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). "Because the ALJ is in the best position to determine a witness's truthfulness and forthrightness . . . a court will not overturn an ALJ's credibility determination unless it is 'patently wrong.'" *Shideler*, 688 F.3d at 310-11 (quotation marks omitted) (quoting *Skarbek*, 390 F.3d at 504-05); *see also Prochaska*, 454 F.3d at 738. Nevertheless, "an ALJ must adequately explain his credibility finding by discussing specific reasons supported by the record." *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013) (citing *Terry*, 580 F.3d at 477); SSR 96-7p, 1996 WL 374186, at *2 (Jul. 2, 1996) ("The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.").

Plaintiff contends that the ALJ erred in the credibility determination by mischaracterizing Plaintiff's daily activities, specifically that the ALJ erroneously relied on Plaintiff's ability to "work out" at the YMCA and to babysit. (ECF 19, p. 11). Plaintiff notes that she was not "working out"

at the YMCA but rather that she was doing an arthritic swim class. (AR 47). As for babysitting, she testified that she watched children ages 7, 9, and 13 on a part-time basis and that, when she was babysitting, she would lean on the couch and put her feet up while she and the children watched movies. (AR 48-49, 72). Plaintiff argues that these sporadic activities do not constitute substantial evidence that she does not suffer disabling pain or mental limitations nor do they establish that she is capable of engaging in substantial work activity. Notwithstanding Plaintiff's characterization of the ALJ's credibility determination as being based solely on these two daily activities, the ALJ discussed these activities as one of many pieces of evidence regarding Plaintiff's physical impairments.

First, the ALJ noted that, prior to the onset date, Plaintiff had a history of complaints of back and leg pain. (AR 23). The ALJ then noted that, in 2013, although Plaintiff occasionally complained of hip, back, and leg pain, examinations were unremarkable, and she treated with her primary care physician and family nurse practitioner. *Id.* The ALJ noted that her physical examinations were not significantly remarkable. *Id.* (citing Exs. 2F, 5F). The ALJ noted that in August 2013 there was some documentation of bilateral hand/ankle swelling with joint tenderness but that it was not a persistent and continuous objective finding during the relevant period. *Id.* Nevertheless, based on this finding, the ALJ included some manipulative limitations in the RFC and reduced Plaintiff's lifting, carrying, pushing, and pulling. *Id.* The ALJ noted that Plaintiff participated in aqua classes at the YMCA prior to her onset date. *Id.* The ALJ noted that Plaintiff's treatment prior to seeing the rheumatologist in 2014 was medications and trigger point therapy. *Id.*

The ALJ then noted that, during a consultative examination in 2013, Plaintiff reported experiencing leg cramps at night and after four hours of standing, that she could sit for one hour

before experiencing numbness in her legs, and that she could walk for one hour before experiencing sciatica. *Id*. The ALJ noted that Plaintiff reported to the examiner that she drives a car and grocery shops and that the Plaintiff did *not* report to the examiner that her mother accompanied her during either, which is in contrast to Plaintiff's hearing testimony noted earlier by the ALJ. (AR 22, 23). The ALJ then noted the findings from the consultative examination that Plaintiff walked with a nonantalgic gait, she used no assistive device, she was able to get on/off the examination table with no difficulty, and she was able to heel to toe walk and tandem walk. (AR 23). The ALJ recognized the examination finding that Plaintiff had some positive straight leg raising and limited range of motion in the lumbar spine. *Id*. The ALJ noted that Plaintiff had a positive Tinel's sign on the right but that her fingers, fine movement, and power in the hands were normal. *Id*. The ALJ noted that there was no evidence of edema of atrophy in the extremities. *Id*.

The ALJ then discussed the April 2014 emergency room visit for complaints of body aches and fibromyalgia, which on examination revealed tenderness in the lower back but normal sensation and strength. *Id*. The ALJ noted that Plaintiff was not admitted to the hospital and that she was discharged without any medications and with the direction to follow up with her primary care physician. *Id*. The ALJ then noted the objective x-ray evidence, noting the normal x-ray of the bilateral sacroiliac joints and of the cervical spine x-ray but also noting that the thoracic x-ray revealed mild superior endplate deformity of T11 and T12 and a lumbar spine x-ray showed mild degeneration at L1-L2 and L2-L3. *Id*.

The ALJ noted that Plaintiff continued to treat with HealthLinc but was then referred for a rheumatologic evaluation for possible fibromyalgia in May 2014 and that, after that point, most of her treatment for back pain was with the rheumatologist. *Id*. The ALJ noted that Plaintiff exhibited

13 tender points on initial evaluation but that the remainder of the examination was within normal limits, including her gait. *Id*. The ALJ noted the finding of tenderness at various joint sites and adequate grip strength. *Id*. The ALJ then commented that Plaintiff's treatment and symptoms in 2015 remained relatively stable. *Id*. The ALJ noted that she had 11 tender points, which was less than during her initial evaluation. (AR 24). The ALJ also noted that the rheumatologist initially assessed Plaintiff with fibromyalgia, spine pain, and seronegative spondyloarthropathy but that her more recent diagnosis was only seronegative spondyloarthropathy. *Id*. The ALJ noted Plaintiff's BMI of 48, a positive straight leg test, and tenderness of the sciatic nerve in September 2015. *Id*. The ALJ noted that in October 2015 it was noted that Plaintiff could not attend her YMCA classes because of her babysitting schedule. *Id*. The ALJ noted that Plaintiff also reported perhaps not babysitting anymore so that she could focus on her wellness. *Id*. The ALJ then considered Plaintiff's obesity. *Id*. The ALJ went on to discuss the evidence of Plaintiff's asthma and allergies, on which the ALJ relied to impose environmental restrictions. *Id*. The ALJ then considered the opinion evidence and the Adult Function Report completed by Plaintiff's mother, both of which the court addresses below.

Nowhere in her briefs does Plaintiff acknowledge this extensive and accurate treatment of the medical record by the ALJ nor does Plaintiff cite any medical evidence to support the more extreme limitations in her testimony. More importantly, nowhere does the ALJ discredit Plaintiff's testimony because of "working out" at the YMCA and because of babysitting. Rather, those facts are woven in to the entire discussion in context. The fact that Plaintiff's performance of the babysitting duties was sedentary is not inconsistent with the RFC. The ALJ considered substantial evidence *in addition to* Plaintiff's daily activities that reflected that her physical impairments did

not preclude a reduced range of sedentary work. *Compare Engstrand v. Colvin*, 788 F.3d 655, 660 (7th Cir. 2015) (concluding that the ALJ's credibility finding was patently wrong).

Plaintiff argues that, in the context of fibromyalgia, it is "crucial that the disability adjudicator evaluate credibility with great care and a proper understanding of the disease" because fibromyalgia "often produce[s] pain and other symptoms out of proportion to the 'objective' medical evidence." (ECF 19, p. 13).[2] But, as noted by the ALJ, Plaintiff's treatment records did not reveal such extreme symptoms. And, nowhere did the ALJ discredit Plaintiff simply because her pain symptoms were not in line with objective testing; rather, the ALJ looked at all of the longitudinal medical evidence and noted the largely normal findings. The Court finds that the ALJ evaluated Plaintiff's fibromyalgia with the requisite care and understanding in light of the record as a whole.

*3.      Mental Impairments*

Last, Plaintiff argues that the ALJ did not properly consider her mental impairments under the listing for fibromyalgia, SSR 12-2p. In support, Plaintiff quotes a few sentences from the ALJ's consideration of the evidence of Plaintiff's mental impairments and argues that the ALJ cherry-picked favorable evidence. Plaintiff also criticizes the ALJ for characterizing her cutting behavior as not severe. Plaintiff misunderstands the ALJ's decision. As for the cutting, the ALJ quoted directly from the hospital record that "extremely superficial abrasions/scratches were seen on the left arm." (AR 28, 649). And, the ALJ correctly summarized the medical records that described Plaintiff as having intact medical status examinations, normal psychomotor activity, memory, good grooming, logical/goal-directed thought processes and normal thought content. (AR 27). A review

---

[2] Plaintiff incorrectly attributes this quotation to *Sarchet v. Chater*, 78 F.3d 305 (7th Cir. 1996). The quotation is from *Robinson v. Berryhill*, No. 16 C 5152, 2017 WL 2216022, at *3 (N.D. Ill. May 19, 2017) (quoting *Johnson v. Colvin*, No. 13 C 1023, 2014 WL 2765701, at *1 (E.D. Wis. June 18, 2014) (citing *Sarchet*, 78 F.3d 305)).

of the ALJ's consideration of the mental health records shows that the ALJ discussed both Plaintiff's good days and bad days over two pages of the decision. (AR 21-22). Once again, Plaintiff does not identify any medical records showing greater limitations due to her mental impairments than those imposed by the ALJ.

In addition, Plaintiff contends that the ALJ "dismissed" Plaintiff's mental limitations and that this is troubling because "fatigue, cognitive or memory problems . . . depression, [and] anxiety disorder" are also symptoms of fibromyalgia that must be considered as part of the fibromyalgia analysis under SSR 12-2p. (ECF 19, p.15). The ALJ considered all of the medical records regarding Plaintiff's mental impairments. There do not appear to be any treatment records indicating that Plaintiff's mental impairments are caused by her fibromyalgia, and Plaintiff does not cite any. Plaintiff has not identified any evidence the ALJ did not consider nor does Plaintiff explain how the limitations in the RFC do not accommodate her mental impairments. Remand is not required on this issue.

## B. Obesity

The Residual Functional Capacity ("RFC") is a measure of what an individual can do despite the limitations imposed by her impairments. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004); 20 C.F.R. §§ 404.1545(a), 416.945(a). The determination of a claimant's RFC is a legal decision rather than a medical one. 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1); *Diaz*, 55 F.3d at 306 n.2. The RFC is an issue at steps four and five of the sequential evaluation process and must be supported by substantial evidence. SSR 96-8p, 1996 WL 374184, *3 (July 2, 1996); *Clifford*, 227 F.3d at 870.

"RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing'

basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p at *1.

"The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." SSR 96-8p, at *3. The relevant evidence includes medical history; medical signs and laboratory findings; the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment; evidence from attempts to work; need for a structured living environment; and work evaluations, if available. *Id*. at *5. In arriving at an RFC, the ALJ "must consider all allegations of physical and mental limitations or restrictions and make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC." *Id*. The "ALJ must also consider the combined effects of all the claimant's impairments, even those that would not be considered severe in isolation." *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009); *see also Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003).

Plaintiff's only dispute with the RFC is that the ALJ purportedly failed to properly evaluate her morbid obesity in conjunction with her fibromyalgia, seronegative spondyloarthropathy, and ankylosing spondylitis. Plaintiff notes that, at the time of the hearing, she was five feet, two inches tall and weighed approximately 275 pounds, with a BMI of 48. Plaintiff also notes that the ALJ found her obesity to be a severe impairment. Plaintiff then argues that the ALJ noted Plaintiff's morbid obesity twice in the decision but failed to consider her morbid obesity in combination with her other physical impairment. (AR 23, 24).

However, Plaintiff fails to acknowledge the ALJ's explicit statement in the context of discussing all of her relevant medical records: "The undersigned took into account all of the claimant's physical impairment symptoms and supporting medical evidence as well as her obesity when limiting her to less than the full range of sedentary work." (AR 24). Social Security Ruling

02-1p requires an ALJ, in formulating the RFC, to consider the exacerbating effects of obesity on underlying conditions even if the obesity itself is not a severe impairment. *Hernandez v. Astrue*, 277 F. App'x 617, 623-24 (7th Cir. 2008). The ALJ in this case did exactly that, taking care to include the rheumatologist's findings, including that Plaintiff routinely had a normal gait. Importantly, Plaintiff does not identify any records or testimony showing greater limitations because of her obesity. The ALJ created a logical bridge between the evidence of record and the RFC in considering Plaintiff's obesity.

### C. Plaintiff's Mother's Statements

Plaintiff's mother, Debbie Buck, completed a Third Party Function Report on October 8, 2013, in which she stated that Plaintiff lived with her and that they spent sixteen hours per day together. Debbie Buck reported that Plaintiff sometimes needs help with buttons, cannot stand for any length of time, sits on the bed to get dressed, uses a hand rail to get in and out of the bath tub, sometimes uses a wheelchair when shopping, and has trouble doing little things with her hands. (AR 249-57). In his decision, the ALJ gave Debbie Buck's report some weight, noting that the statements are based on personal observation but that the statements suggest limitations greater than those supported by Plaintiff's activities and the "limited positive findings upon physical examinations and mental status examination." (AR 30-31).

In her brief, Plaintiff acknowledges that the ALJ evaluated Debbie Buck's report under Social Security Listing 06-03p, which governs opinions for sources who are not "acceptable medical sources." (ECF 19, p. 18). However, Plaintiff argues that the ALJ should have considered Debbie Buck's report under the provision of SSR 12-2p on fibromyalgia that addresses information from "nonmedical sources." Yet, Plaintiff offers no legal basis for why the ALJ's consideration of Debbie

Buck's statement under SSR 06-03p is any different than it would be under SSR 12-2p. The ALJ did not "disregard" Debbie Buck's statement as asserted by Plaintiff. (ECF 19, p. 18). Plaintiff has not identified any aspect of Debbie Buck's statement that would be viewed differently if the ALJ had cited SSR 12-2p. Remand for a reference to SSR 12-2p in relation to Debbie Buck's Adult Function Report is not warranted.

On the merits of the ALJ's evaluation of Debbie Buck's statement, Plaintiff argues that the ALJ erred in finding that Debbie Buck's statement was inconsistent with the record evidence. Plaintiff then generally asserts, without any factual analysis, that "as discussed previously herein, the alleged inconsistency is not supported by the record and is based on selective misstatements from the voluminous record." (ECF 19, p. 18). The only alleged misstatements previously identified by Plaintiff in her brief were regarding working out at the YMCA and babysitting. But, as discussed by the Court above, the ALJ did not base his findings solely on those two facts but rather by thoroughly discussing the evidence of record. It is that analysis that the ALJ references when weighing Debbie Buck's statement. Remand for reconsideration of Debbie Buck's Adult Function Report is not warranted.

### D. Treating Physicians' Opinions

Three treating physicians gave opinions in this case, all of which are summarized in the factual background above: treating physician Dr. Drachenberg, treating psychiatrist Dr. Hunter, and treating rheumatologist Dr. Reddy. In determining whether a claimant is disabled, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence . . . received." 20 C.F.R. §§ 404.1527(b), 416.927(b). And, the ALJ evaluates every medical opinion received. 20 C.F.R. §§ 405.1527(c), 416.927(c). This includes the opinions of

nonexamining sources such as state agency medical and psychological consultants as well as outside medical experts consulted by the ALJ. 20 C.F.R. §§ 405.1527(e)(2), 416.927(e)(2).

An ALJ must give the opinion of a treating doctor controlling weight if (1) the opinion is supported by "medically acceptable clinical and laboratory diagnostic techniques" and (2) it is "not inconsistent" with substantial evidence of record. *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010); *see also Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). In weighing all opinion evidence, the ALJ considers several factors and "must explain in the decision the weight given" to each opinion. 20 C.F.R. § 404.1527(e)(2)(ii), (iii); *Scrogham v. Colvin*, 765 F.3d 685, 697-98 (7th Cir. 2014); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). When a treating physician's opinion is not given controlling weight, the ALJ must nevertheless consider certain factors to determine how much weight to give the opinion, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability (such as medical signs and laboratory findings), and specialization. 20 C.F.R. §§ 404.1527(c)(2)-(5), 416.927(c)(2)-(5).

Plaintiff argues that the ALJ improperly weighed the opinion of each of the three doctors, relying again on the ALJ's alleged misstatement of the record regarding "working out at the YMCA" and "babysitting." Plaintiff also contends that the ALJ did not discuss all the factors and that the ALJ did not consider the treatment history and specialty of each doctor. The Court finds that the ALJ properly analyzed each opinion. First, the ALJ accurately summarized the opinion of each doctor. (AR 24-25). The ALJ noted that Dr. Hunter was an "M.D.", which indicates that the ALJ knew she is a psychiatrist. *Id*. at 24. The ALJ described Dr. Reddy as Plaintiff's rheumatologist and referenced the start date of treatment in the decision. (AR 25). Although the ALJ did not specifically list the

length of time that Plaintiff treated with Dr. Drachenberg in weighing opinion evidence, the ALJ discussed the longitudinal treatment in summarizing the medical evidence earlier in the decision.

As for the remark that Plaintiff was "able to babysit . . . and participate in exercise activity at the YMCA," the ALJ made that statement in the context of weighing Dr. Hunter's opinion regarding Plaintiff's mental impairment and the finding that the medical evidence showed that Plaintiff's "cognition, memory, thought processes, thought content and judgment/insight are routinely within normal limits." (AR 25). Plaintiff offers no explanation why babysitting and participating in an exercise activity are not indicative of these mental abilities. The ALJ did not err in relying on these facts in weighing the expert opinion evidence. Notably, Plaintiff does not cite any evidence of record that supports the mental limitations imposed by Dr. Hunter and rejected by the ALJ. The ALJ also commented that Plaintiff was able to work out at the YMCA as well as babysit in the context of weighing the opinions as to her physical impairments. But, as with the RFC, this reference was just one of many in discussing the opinion evidence. Specifically, the ALJ noted that Plaintiff's symptoms were generally controlled with medication and exercises, that her tender points had decreased, that her physical examinations did not regularly show significant findings, and that her gait, muscle strength, and sensation were routinely normal. (AR 25). All of these findings are supported by the evidence of record, yet Plaintiff does not acknowledge or contest these findings in her brief, focusing solely on the exercise and babysitting. The ALJ then addressed why the sit/stand option is not warranted. *Id*. Again, Plaintiff does not discuss or contest these findings. Notably, in the cases cited by Plaintiff, the Seventh Circuit Court of Appeals affirmed the ALJ's finding that a medical opinion was not entitled to substantial weight based on the evidence of record,

just as with the ALJ's decision in this case. *See Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006).

And, in *Schreiber v. Colvin*, No. 12-2602, 2013 WL 1224905, at *7 (7th Cir. 2013), cited by Plaintiff, the court explicitly rejected Schreiber's argument, also made by Plaintiff in this case, that the ALJ failed to properly analyze a treating physician's opinion on the basis that the ALJ did not specifically address each factor set forth in § 404.1527. The court explained:

> When an ALJ chooses to reject a treating physician's opinion, she must provide a sound explanation for the rejection. Here, while the ALJ did not explicitly weigh each factor in discussing Dr. Belford's opinion, his decision makes clear that he was aware of and considered many of the factors, including Dr. Belford's treatment relationship with Schreiber, the consistency of her opinion with the record as a whole, and the supportability of her opinion. While we may not agree with the weight the ALJ ultimately gave Dr. Belford's opinions, our inquiry is limited to whether the ALJ sufficiently accounted for the factors in 20 C.F.R. § 404.1527 and built an 'accurate and logical bridge' between the evidence and his conclusion. We find that deferential standard met here.

*Schreiber*, 2013 WL 1224905, at *7. Likewise, the ALJ in this case gave good reasons for rejecting the physicians' opinions, primarily because they are inconsistent with other evidence of record. *Id.* at *5; (AR 25). Also like the claimant in *Schreiber*, Plaintiff does not cite any evidence of record to support the treating physicians' opinions nor does Plaintiff cite any evidence ignored by the ALJ that contradicted his ultimate decision. *See Schreiber*, 2013 WL 1224905, at *8. Plaintiff contends that the ALJ pointed out the "elements that detract from the treating physician's opinions without giving consideration to the *vastly more numerous elements* that support it." (ECF 19, p. 23) (emphasis added). But Plaintiff does not identify any of the "vastly more numerous elements that support" the physicians' opinions. The ALJ did not err in weighing the treating physicians' opinions.

**E. Step Five**

Finally, Plaintiff argues that she is unable to perform the jobs identified by the ALJ at step five because the limitations identified by her treating physicians would preclude those jobs. As found in the previous section, the ALJ did not err in declining to adopt the limitations proposed by the treating physicians. Thus, the ALJ was not required to include those limitations in the hypotheticals to the vocational expert or to consider them the limitations when identifying jobs at step five. Remand is not required at step five of the analysis.

**CONCLUSION**

Based on the foregoing, the Court hereby **DENIES** the relief sought in Plaintiff's Opening Brief [DE 10]. The Court **DIRECTS** the Clerk of Court to **ENTER JUDGMENT** in favor of Defendant Commissioner of the Social Security Administration and against Plaintiff Stephanie Ann Buck.

So ORDERED this 23rd day of April, 2018.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT